1  MICHAEL R. SHAPIRO, ESQ. (SBN 37011)
Law Offices of Michael R. Shapiro, APC
2  612 North Sepulveda Boulevard, Suite 11
Los Angeles, California 90049
3  (310) 472-8900     Fax (310) 472-4600
mickeyimc@aol.com
4
TERRAN T. STEINHART, ESQ. (SBN 36196)
5  Steinhart Law Offices
4311 Wilshire Boulevard, Suite 520
6  Los Angeles, California 90010-3717
(323) 933-8263     Fax (323) 933-2391
7  terran@steinhartlaw.com

8  Attorneys for Plaintiff DARNAA, LLC

9

10            UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA

12              SAN JOSE COURTHOUSE

13

14  DARNAA, LLC, a Connecticut       )   Case No.:_____
Limited Liability Company,           )
15                                   )   COMPLAINT SEEKING
                 Plaintiff,          )   COMPENSATORY AND
16                                   )   PUNITIVE DAMAGES
                                     )   ARISING FROM: (1) BREACH
17       vs.                         )   OF CONTRACT PER BREACH
                                     )   OF COVENANT OF GOOD
18  GOOGLE, INC., a Delaware         )   FAITH AND FAIR DEALING;
Corporation, and YOUTUBE, LLC,       )   (2) INTENTIONAL
A Delaware Limited Liability         )   INTERFERENCE WITH
19  Company,                         )   PROSPECTIVE ECONOMIC
                                     )   DAMAGE; (3) NEGLIGENT
20               Defendants.         )   INTERFERENCE WITH
                                     )   PROSPECTIVE ECONOMIC
21                                   )   ADVANTAGE; AND
                                     )   (4) DEFAMATION, TRADE
22                                   )   LIBEL AND/OR FALSE
                                     )   REPRESENTATION OF FACT
23                                   )   IN VIOLATION OF THE
                                     )   LANHAM ACT
24                                   )
                                     )   DEMAND FOR JURY TRIAL
25                                   )
26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRADISTRICT ASSIGNMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     Darnaa, LLC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     Darnaa (Non-party). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     Google. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     YouTube. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

GENERAL ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FIRST CAUSE OF ACTION
     Breach of Contract  Per Breach of Covenant of Good Faith and
     Fair Dealing, Against All Defendants.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

SECOND CAUSE OF ACTION
     Intentional Interference with Prospective Economic Advantage,
     Against All Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

THIRD CAUSE OF ACTION
     Negligent Interference with Prospective Economic Advantage,
     Against All Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

FOURTH CAUSE OF ACTION
     Defamation and/or False Representation of Fact in Violation
     of Lanham Act, Against All Defendants.. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

DEMAND FOR TRIAL BY JURY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

COMPLAINT SEEKING COMPENSATORY AND PUNITIVE DAMAGES

1

## **<u>TABLE OF EXHIBITS</u>**

2

Page

Ex. 1  YouTube Terms of Service Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Ex. 2  March 22, 2014 email: Plaintiff to YouTube. . . . . . . . . . . . . . . . . . . . . . . 27

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT SEEKING COMPENSATORY AND PUNITIVE DAMAGES

Plaintiff Darnaa, LLC complains and alleges as follows:

**JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction herein pursuant to 28 U.S.C.§1332 (Diversity of Citizenship), in that the amount in controversy is in excess of $75,000, and Plaintiff is deemed to be a citizen of Connecticut for diversity of citizenship purposes because it was formed and has its principal place of business in Connecticut; and defendants are deemed to be citizens of Delaware and California in that they were both formed in Delaware and have their principal places of business in California.  This Court also has subject matter jurisdiction herein pursuant to 28 U.S.C. § 1331 (Federal Question) in that one of the causes of action arises under the laws of the United States, namely, 15 U.S.C. § 1125.

2.     Both defendants are subject to personal jurisdiction in California because each has its principal place of business in California.

3.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b) in that both defendants are deemed to reside in said judicial district because each has its principal place of business in said district.  Moreover, paragraph 14 of the Terms of Service contract (Exhibit 1 hereto) provides that any claim arising in whole or in part from the display of a video on the YouTube Website shall be decided exclusively by a court of competent jurisdiction located in Santa Clara County, California, the county in which this Court is located.

**INTRADISTRICT ASSIGNMENT**

4.     The San Jose Courthouse is the proper Courthouse at which this case should be assigned pursuant to the facts set forth in paragraph three, above, which are incorporated herein by reference.

**THE PARTIES**

**Darnaa, LLC**

5.     At all times relevant herein, Plaintiff was and is a limited liability company organized and existing under the laws of the State of Connecticut, with

1   its principal place of business in the State of Connecticut.

2        6.    Plaintiff is informed and believes and thereupon alleges that at all

3   times relevant herein, defendant Google, Inc. ("Google") was and is a corporation

4   organized and existing under the laws of the State of Delaware, with its principal

5   place of business in Santa Clara County, California.

6        7.    Plaintiff is informed and believes and thereupon alleges that at all

7   times relevant herein, defendant YouTube, LLC ("YouTube") was and is a limited

8   liability company organized and existing under the laws of the State of Delaware,

9   with its principal place of business in Santa Clara County, California.

10        8.    Plaintiff is informed and believes and thereupon alleges that at all

11   times relevant herein, YouTube was and is wholly owned and controlled by

12   Google and acted and presently acts as the agent of Google and in concert and

13   participation with Google, such that all acts of YouTube were and are imputable to

14   Google as the principal of YouTube.

15        9.    At all times relevant herein, Plaintiff owned and operated an

16   Independent Music Label whose business was and is to enter contracts with

17   musical recording and performing artists, and share in the earning of revenues

18   with such artists by producing and promoting the musical recording and

19   performing careers of such artists, such that Plaintiff and said artists jointly earn

20   revenue by, including without limitation: the sale of recorded music and live

21   musical performances by the artists, commercial endorsements by the artists, the

22   sale of products related to the artists, and garnering advertising revenue by using

23   the artists' musical performances, including music videos, as the entertainment to

24   attract the advertising audience.

25   **Darnaa (Non-party)**

26        10.    At all times relevant herein, Darnaa was and is a professional music

27   recording and performing artist that is under contract to Plaintiff.  As

28   differentiated from famous, financially successful music artists which are known

as established artists, although Darnaa has professionally participated in the music business for a few years, she is considered to be a new or unestablished music artist.  Through the date of the filing of this Complaint, Darnaa has professionally recorded 40 songs and released three for sale to the public, has performed in the production of 11 music videos depicting her singing various of her recorded songs, and has performed in more than 60 live performance engagements.  Such music videos were produced for display on the Internet as one of the means of advertising and promoting Darnaa's professional career in the music business for the purpose of increasing the revenues from her professional activities that are jointly shared by Plaintiff and Darnaa.  As a result of the sale of her recorded music, the display of her music videos on the Internet, her live performances, and a variety of promotional and advertising activities, including the use of Internet social media, although Darnaa has not reached the level of being considered an established artist in the music business, she does have a significant fan base that knows and admires her musical talents.

11.    During the course of the aforesaid Plaintiff-Darnaa contractual relationship, in order to promote the professional career of Darnaa, Plaintiff has monetarily invested in excess of $4 million, including without limitation: expenditures for singing and performing lessons, clothing, grooming, traveling, advertising, promotion, production of recorded music, and production of music videos.

**Google**

12.    At all times relevant herein, amongst other commercial enterprises, Google was and is a world-wide major advertising company, including the earning of substantial advertising revenues from activities on the Internet, the most well-known of which is the Google Internet search engine, such that "Googling" has become a generic term for searching for information on the Internet.

/ /

**YouTube**

13.    In addition to being the name of one of the defendants, YouTube is the name of a popular Website on the Internet which is self-described on the Website as follows:

> "Launched in May 2005, YouTube allows billions of people to discover, watch and share originally-created videos.  YouTube provides a forum for people to connect, inform, and inspire others across the globe and acts as a distribution platform for original content creators and advertisers large and small."

14.    The YouTube Website was originally owned and operated by defendant YouTube.  However, several years ago and prior to the wrongful conduct of defendants described herein, Google acquired defendant YouTube and the YouTube Website.  Plaintiff is informed and believes and thereupon alleges that since said acquisition, the YouTube Website has been operated on behalf of Google, and to the extent that it is operated by defendant YouTube, YouTube so operates it as an agent for Google such that all activities in that regard performed by YouTube are imputable to Google as its principal.

**GENERAL ALLEGATIONS**

15.    In the present-day popular music industry, in order for a new or unestablished music artist to launch a professional career and have a significant opportunity to achieve financial success, it is imperative that the artist display one or more music videos on the Internet and that the videos obtain a large number of views by the public, meaning millions of views.  Garnering this quantity of views on the Internet has become the single most important indicia of potential success for a new or unestablished artist.  Although a music video's obtaining a large number of such views is not a guarantee of financial success, in today's music industry, it is not reasonable possible for a new or unestablished music artist to achieve financial success without garnering such views.

16.     Plaintiff is informed and believes and thereupon alleges that presently, approximately 75% of the music artists in the popular music industry are signed to recording companies that are affiliated with either of two major record industry conglomerate groups: Universal Music Group ("Universal") and Sony Music Entertainment ("Sony").

17.     Plaintiff is informed and believes and thereupon alleges that:

In or about 2009, Universal, Sony, Google and Abu Dabi Media formed a joint venture that launched Vevo, a website on which is displayed the music videos of artists signed to Universal, Sony or their distributed labels/affiliated entities worldwide.  Only the music videos of artists signed to such Universal or Sony group recording companies are displayed on Vevo.

The music videos on Vevo are syndicated across the Internet, with Google managing the advertising revenue-producing activities of the Vevo Website, and Google and Vevo sharing said advertising revenue.

18.     Plaintiff is informed and believes and thereupon alleges that:

Recording artists that are not signed to recording companies affiliated with Vevo are relegated to displaying their music videos on the Internet on websites other than Vevo.  Of the various websites on which a recording artist can display his or her music videos, by prevailing custom in the music industry, the YouTube Website has emerged as the dominant, outcome-determinative website for that purpose because the companies with whom a recording artist must do business in order to achieve financial success look to the number of music video views obtained on YouTube, as differentiated from other websites, as the indicia of the artist's popularity and potential for economic success.  These companies include record companies, music publishers, talent agencies, concert promoters, and merchandising, sponsorship, and advertising companies.

19.     In summary, for a non-Vevo new or unestablished recording artist, such as Darnaa, to have a significant opportunity of achieving economic success in the music industry, the artist must display one or more music videos on YouTube and demonstrate his or her popular appeal by garnering millions of views.

20.     YouTube does not charge diplayers of videos to display their videos on the YouTube Website.  Notwithstanding, defendants earn substantial advertising revenue from the operation of the YouTube Website from advertisers who pay for advertising displayed on the Website because of the huge volume of viewer traffic drawn to the Website to view the displayed videos.  Some of the Website advertising is on commercials embedded at the beginning of a music video similar to television program commercials.  Other advertising is side advertising that is available for viewing by viewer traffic on the Website as they navigate the Website in search of videos displayed thereon.

21.     In order to increase the chances of any particular music video's garnering the desired millions of views on the YouTube Website, record companies, such as Plaintiff, sometimes spend hundreds of thousands dollars with respect to the video, including without limitation: to produce a high entertainment and technical quality music video, and then to promote and advertise the existence of the video on YouTube in order to promote viewer traffic to the video, and in particular, to the video's URL, i.e., the Internet address at which the video may be viewed.  In such promotion and advertising campaigns, the key advertising fact is the URL at which the particular music video may be viewed, such that any potential viewer inspired by the advertising and promotion campaign to view the video need only access the URL on the Internet in order to so view it.  A common form of advertising to promote viewer traffic to a music video is to advertise on websites other than YouTube, in which the advertisement contains an embedded hyperlink to the video's URL on YouTube such that a viewer of the advertisement on the other website can access the video on YouTube by clicking on the

COMPLAINT SEEKING COMPENSATORY AND PUNITIVE DAMAGES

1   embedded URL link, thereby enabling the viewer to view the video without
2   officially entering the YouTube Website and navigating on that site to find the
3   display of the video in question.

4        22.    At all times relevant herein, any person or entity desiring to display a
5   video on the YouTube Website was required to electronically agree to the Terms
6   of Service contract ("TOS") found on the YouTube Website.  A copy of said TOS
7   that was in effect at the time of the wrongful conduct alleged in this Complaint is
8   attached hereto as Exhibit 1 and incorporated herein by reference.

9        23.    The TOS is a contract of adhesion offered to persons and entities that
10  wish to display videos on the YouTube Website on a take it or leave it basis.  The
11  use of such contracts of adhesion is exceedingly wide-spread on the Internet.
12  Plaintiff is informed and believes and thereupon alleges that, typically, users of the
13  Internet electronically agree to such contracts of adhesion without reading them
14  and therefore without knowing or understanding what their terms and provisions
15  are.

16       24.    Because of the substantial cost involved in producing a high quality
17  music video, and the substantial cost of promoting viewership of the video display
18  on the YouTube Website pursuant to an advertising/promotion campaign, record
19  companies, such as Plaintiff, that produce and display music videos on YouTube
20  rely on the good faith and fair dealing of defendants not to do anything that would
21  unfairly and/or unreasonably interfere with the display of their music videos on
22  YouTube.

23       25.    Plaintiff is informed and believes and thereupon alleges that as the
24  owner and operator of the YouTube Website, part owner of the Vevo Website, and
25  manager of the advertising revenue-producing activities of the Vevo Website with
26  Google and Vevo sharing said advertising revenue, at all times relevant herein,
27  defendants were and are well-aware of all of the above facts alleged herein in the
28  General Allegations section of this Complaint.

26.     Prior to in or about March 2014, Plaintiff had produced and displayed on the YouTube Website two music videos, featuring the musical performance of Darnaa, as to the following songs with the following official view counts on said Website:

| Title | Dates | View Count |
|-------|-------|------------|
| "Runaway" | 2012 | 1.9 million |
| "Already Loving You" | 2013 | 1.1 million |

27.     The two above music videos were posted on YouTube with a relatively small advertising and promotion budget, almost exclusively relying on social media and an extensive campaign with ReverbNation, which during the year prior to the posting on YouTube of the "Cowgirl" video, garnered Plaintiff with more than 20 million ReverbNation impressions.  The view count results of the aforesaid two videos on modest promotion/advertising budgets emboldened Plaintiff to invest large amounts with regard to the "Cowgirl" video promotion/advertising campaign, as more particularly set forth below.

28.     In or about February 2014, Plaintiff posted a third music video on the YouTube Website, featuring Darnaa's performance of a song entitled "Cowgirl" ("'Cowgirl' video").  The production cost of the video was $100,000.  Plaintiff mounted an economically huge promotion and advertising campaign with respect to the "Cowgirl" video in order to promote viewer traffic to its display on the YouTube Website, specifying in the campaign the "Cowgirl" video URL on the YouTube Website as the Internet address at which the video could be viewed.  The display and promotion of the video on YouTube was coordinated with and in anticipation of the release of the recorded song, "Cowgirl," being offered for sale to the public on iTunes and/or Amazon.com, commencing April 1, 2014.  The promotion and advertising of the YouTube Website display of the "Cowgirl" video, and coordinated iTunes and/or Amazon.com release of the song for sale to the public included the following:

1   **Promotional Events**

2        a.    **South by Southwest Music Fest**.  Plaintiff spent $350,000 at

3   the South by Southwest Music Fest for promotional activities before the

4   April 1, 2014 iTunes and/or Amazon.com release date.  All of those

5   promotional activities prominently indicated the URL address of the subject

6   video on the YouTube Website.  These promotional activities took place on

7   March 13-16, 2014 in Austin, Texas, where over 400,000 people saw a

8   promotion of the video on a mobile video truck in a 12,000 sq. ft. event tent

9   in which Plaintiff hosted 40 bands.  PR Web issued a press release

10  promoting the aforesaid Music Fest event, and the subject video picked up

11  3,950 online blogs and news sources with combined viewership of more

12  than 10 million readers.

13       Star Magazine and 10 other online magazines interviewed Darnaa

14  about the song and the new video during the event.  Darnaa was also

15  interviewed for 15 minutes on the KVUE, Austin, Texas segment of the

16  Today Show on Saturday, March 15, 2014, promoting the video.  At least 1

17  million people saw the interview, and the URL link was placed on that

18  station's Website which is viewed by at least a half million people.

19       b.    **NBA Allstar Weekend**.  This promotion took place during

20  February 14-17, 2014, focused on highlighting Darnaa and to promote

21  traffic to the "Cowgirl" video as posted on the YouTube Website at a cost of

22  $400,000, including paying for 15 billboards throughout New Orleans; and

23  a $300,000 concert series at the Howling Wolf Club in New Orleans.

24  **Clear Channel Internet Radio Campaign**

25  Clear Channel Communications (through iHeart Radio, the largest radio

26  group in the United States) has a program known as "massive artist integration

27  program" linked to its radio marketing program.  Darnaa is only the fourth music

28  artist to be accepted into the powerful promotional engine.  The cost of the

COMPLAINT SEEKING COMPENSATORY AND PUNITIVE DAMAGES

1   campaign was between $250,000-$300,000.  The purpose of the campaign was to
2   promote traffic to the "Cowgirl" music video URL on the YouTube Website.  This
3   campaign utilized iHeartRadio and its affiliates, in which millions of viewers of
4   hundreds of iHeartRadio Internet websites had access to the subject music video
5   URL link embedded in those websites.  This entire Internet radio campaign was
6   centered on promoting traffic to the "Cowgirl" vido as displayed on YouTube by
7   allowing up to 25 million viewers of the iHeartRadio websites to access the video
8   by clicking on the URL hyperlink to the video embedded in the hundreds of
9   iHeartRadio websites.

10      29.    Based upon the substantial promotion and advertising expenditures
11  devoted to promoting views of the "Cowgirl" video on YouTube, it was
12  reasonably anticipated that 8 to 12 million viewers would have viewed the video
13  by the April 1, 2014 iTunes and/or Amazon.com release date, the song would have
14  garnered sales of between one and two million singles on iTunes and/or
15  Amazon.com and an additional $7-8 million in revenue rich streams, including a
16  major concert tour that would have allowed Plaintiff to recoup its aforesaid major
17  investment in the production, promotion and advertising of the video.

18      30.    Within a few days after Plaintiff's posting of the "Cowgirl" video on
19  YouTube, Plaintiff learned that defendants had removed the display of the video
20   from the YouTube Website.  Immediately upon learning of said removal, Plaintiff
21  contacted YouTube and was advised that the display had been removed because
22  Plaintiff had purportedly violated paragraph 4.H. of the TOS (Exhibit 1), which
23  provides as follows:

24          "You agree not to use or launch any automated system, including
25          without limitation, 'robots,' 'spiders,' or 'offline readers,' that accesses the
26          Service in a manner that sends more request messages to the YouTube
27          servers in a given period of time than a human can reasonably produce in
28          the same period by using a conventional on-line web browser."

1    31.    Upon learning of the aforesaid accusation, on March 22, 2014,

2    Plaintiff immediately responded with an email to YouTube, a copy of which is

3    attached hereto as Exhibit 2, and incorporated herein by this reference as if fully

4    set forth.  In the email, Plaintiff requested that YouTube immediately restore the

5    display of the video under its aforesaid original URL, stating that the aforesaid

6    accusations were unfounded, that the video's view count was legitimate and

7    earned through aggressive, heavy and expensive promotion of the video,

8    mentioning that the URL link for the video was embedded in thousands of

9    websites and blogs such that by the time the promotion was over, Plaintiff

10   anticipated 8 to 12 million legitimate views of the video.  Plaintiff thereupon

11   outlined in the email the essential facets of the promotion and advertising

12   campaign to promote legitimate views to the video.  Plaintiff requested that

13   YouTube restore display of the video under its original URL by the following

14   Monday (two days after the date of the email), failing which YouTube would have

15   irreparably damaged Plaintiff's reputation, business and the ultimate success of the

16   campaign to promote the music career of Darnaa, which was estimated to generate

17   tens of millions of dollars in sales of her related record product, concert tour and

18   product endorsements which, were already being negotiated.

19   32.    Within a few days after sending the Exhibit 2 email to YouTube,

20   without any prior notice or communication to Plaintiff, Plaintiff ascertained that

21   defendants had restored the display of the subject video to the YouTube Website,

22   but under a different URL than the original URL, and with the view count on the

23   new URL starting at zero instead of the view count that had been garnered under

24   the original URL.

25   33.    Upon learning that the display of the video had been restored, but

26   with a different URL, the management of Clear Channel magnanimously offered

27   to re-promote and advertise the video in a second advertising campaign without

28   charging Plaintiff for the second campaign because the first campaign had come to

naught as a result of the wrongful removal of the display of the video under its original URL.  However, shortly after Clear Channel began to launch the second campaign, without any prior notice or warning from YouTube, the display of the video under its second URL was removed from YouTube.

34.     Upon the second removal of the display of the video from YouTube, the renewed Clear Channel advertising campaign became moot and worthless, despite the magnanimity of Clear Channel.  Again, without any prior notice or communication to Plaintiff, defendants restored the display of the video to the YouTube Website, but under a third URL and with the view count reduced again to zero.  At that point, Plaintiff ceased all efforts and expenditures to promote views of the video display on YouTube.  Despite complete lack of such promotion and advertising, under its third YouTube URL, the video has garnered in excess of 600,000 views.

## FIRST CAUSE OF ACTION

### Breach of Contract  Per Breach of Covenant of Good Faith and Fair Dealing, Against All Defendants

35.     Plaintiff repeats and realleges all of the above allegations and incorporates them herein by reference as if fully set forth.

36.     In electronically agreeing to the provisions of the TOS, neither Plaintiff nor any of its human agents read the provisions.

37.     In agreeing to the provisions of the TOS, and thereupon displaying the "Cowgirl" video on the YouTube Website, Plaintiff reasonably relied upon its belief in defendants' presumed good faith and fair dealing, relying upon the belief that as long as a music video displayer, such as Plaintiff, placed commercially and ethically acceptable content in its video and displayed the video in an ethical manner without illegitimately inflating its view count, defendants would operate in good faith and deal fairly with the video displayer such that defendants would do nothing to interfere with the display of the video on the YouTube Website, but

1   would permit it to continue to be displayed and to garner the legitimate view count

2   to which it was entitled in response to its true public popularity.  Based upon this

3   belief and reliance, Plaintiff planned and executed the above-described promotion

4   and advertising campaign, including the expenditure of the aforesaid hundreds of

5   thousands of dollars in furtherance of that campaign.

6       38.   Plaintiff duly performed all of the covenants and conditions on its

7   part to be performed under the TOS.  Furthermore, Plaintiff categorically denies

8   that it failed to comply with and/or violated any of said terms, including without

9   limitation, the above-quoted paragraph 4.H.  Moreover, Plaintiff did not engage in

10  any activities to create an illegitimate view count with respect to the "Cowgirl"

11  video, but rather expended large sums of money to generate a large, legitimate

12  view count of an anticipated 8 to 12 million views of the video on YouTube.

13      39.   Defendants breached the TOS contract in that they violated the

14  implied covenant of good faith and fair dealing in twice removing the display of

15  the subject video from the YouTube Website in bad faith, because each of said

16  removals was perpetrated without any legitimate factual basis upon which to

17  premise the same.  Furthermore, in sending the Exhibit 2 email to defendants,

18  Plaintiff described in detail the promotion and advertising activities and

19  expenditures it had made in order to support its contention that it had not

20  illegitmately inflated the view count; and thereupon requested that defendants

21  promptly restore the display of the video to the YouTube Website under its

22  original URL.  Defendants further breached the TOS contract because they

23  wrongfully ignored Plaintiff's aforesaid Exhibit 2 request.

24      40.   In breaching said contract, amongst other things, defendants'

25  restoration of the display of the video on the YouTube Website on two separate

26  occassions, after accusing  Plaintiff of engaging in violation of the TOS by

27  artificially inflating the view count, demonstrates the falsity of the accusation, as it

28  is against common sense to, in essence, permit a thief to re-enter the site of his

theft after he has previously been caught committing a theft there.  This is especially true when one lets the alleged thief back into the site not just once after the first theft, but a second time after the second theft!  The bad faith of defendants conduct is further underscored by the fact that each time they restored the display of the video to the YouTube Website, they did so under a different URL with the view count reduced to zero.  If they were claiming to restore the display of the video to remedy a mistake on their part in previously removing the display, the good faith and proper remedy would have been to promptly restore the display with the same URL and resume the view count at the number of views it had previously achieved prior to removal of the display.

41.    Defendants' aforesaid conduct demonstrates a motive to punish Plaintiff for purported wrongdoing in allegedly manufacturing a falsely-inflated view count, and thereafter, nonsensically allowing Plaintiff, the accused rule-violator, the opportunity to commit the same purported wrongful conduct again … and again.  Defendants' bad faith is further underscored by their second removal of the display of the video after being advised by Plaintiff in its Exhibit 2 email as to the specifics of its huge expenditure in advertising and promotion money to promote legitimate views of the video, to achieve a true view count through honest and good faith means.

42.    As a direct and proximate result of defendants' aforesaid bad faith breach of contract by reason of their breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in several respects, including without limitation:

a.    Loss of its out-of-pocket investment in the production of the video and the advertising and promotion campaign to promote a legitimate view count, in the amount of at least $1,150,000.

b.    Revenue from the estimated sale of between one and two million singles recordings of the "Cowgirl" song, and an additional $7-8

COMPLAINT SEEKING COMPENSATORY AND PUNITIVE DAMAGES

million in revenue rich streams generated from, without limitation, concert tours and product endorsements; and further related damages in an amount according to proof, but not less than $25 million.

      c.    Injury to the business reputation of Plaintiff in an amount according to proof, but not less than $25 million.

## SECOND CAUSE OF ACTION

## Intentional Interference with Prospective Economic Advantage,

## Against All Defendants

43.    Plaintiff repeats and realleges each of the above paragraphs and incorporates them herein as if fully set forth.

44.    At times relevant herein, Plaintiff had a past, present and prospective future beneficial economic relationship with:

      a.    The music fans of Darnaa in that during the period that Darnaa has been a party to a music artist contract with Plaintiff, Darnaa and Plaintiff have shared revenues from monies paid by Darnaa's fans for her recorded and/or live musical performances.

      b.    Clear Channel Communications ("Clear Channel") by reason of Plaintiffs' participation with Clear Channel in the aforesaid promotion and advertising campaign constructed and executed for the purpose of promoting millions of legitimate views of the display of the "Cowgirl" video on the YouTube Website.

45.    As is the case with defendant Google, amongst other things, Clear Channel is a very large, successful advertising company.  Plaintiff is informed and believes and thereupon alleges that by reason of its market share in the advertising industry, Clear Channel constitutes a major advertising industry competitor of Google.

/ /

/ /

COMPLAINT SEEKING COMPENSATORY AND PUNITIVE DAMAGES

1    46.    Plaintiff is informed and believes and thereupon alleges as follows:

2    In garnering advertisers to buy advertising on the YouTube Website,

3    amongst other things, defendants promote the value of such advertisement

4    in relation to the viewer traffic that accesses the Website for the purpose of

5    locating and viewing the videos displayed thereon.  Such volume of Website

6    traffic creates the opportunity for the viewing of side advertisements on the

7    site.  Therefore, when a viewer accesses a video from a Website other than

8    YouTube by way of clicking on a URL link to the video embedded in the

9    other website, such access decreases the navigational traffic that otherwise

10   would be present on the YouTube Website, and thereupon decreases the

11   audience for side advertisements.

12   Through use of sophisticated tracking software, defendants are able to

13   ascertain whether the viewers of any particular video displayed on the

14   YouTube Website arrive at the video by navigating through the YouTube

15   Website, or alternatively, by clicking on a link embedded in a non-YouTube

16   Website.  Defendants are also able to track the origin site of the incoming

17   viewer to ascertain where the viewer clicked on the URL of any particular

18   video displayed on YouTube.

19   As a result of this technological capability, defendants were able to

20   ascertain that the large majority of the viewers accessing the "Cowgirl"

21   video on YouTube came to the video by clicking links embedded in various

22   of the hundreds of Clear Channel Internet radio websites.

23   From the point of view of defendants, that meant Clear Channel was

24   profiting from garnering advertising revenue on its websites at the expense

25   of defendants' not garnering advertising revenue on the YouTube Website.

26   Thus, the simple remedy from the point of view of defendants was to

27   remove the display of the "Cowgirl" video from the YouTube Website,

28   thereby vitiating the value of the advertising dollars paid by Plaintiff to

COMPLAINT SEEKING COMPENSATORY AND PUNITIVE DAMAGES

1   Clear Channel.  In doing so, defendants only had to make the minimum
2   adjustment of removing the display of the "Cowgirl" video temporarily,
3   rather than permanently, and when they restored its display on YouTube, to
4   restore it with a different URL which vitiated the money spent by Plaintiff
5   in promoting the original URL; and then further punishing Plaintiff by
6   wiping out the previous view count obtained by the video by reason of
7   starting the view count at zero at the new URL.

8        It is the practice of the YouTube Website to display the view count
9   of each video at its display site when the video is accessed by a viewer so
10  that each viewer can assess the popularity of the video by how many
11  previous views it has garnered.  Thus, in starting the view count at zero each
12  time the subject video display was restored on YouTube with a different
13  URL, not only was Plaintiff penalized by not receiving the overall view
14  count credit which the video had earned, but Plaintiff was further penalized
15  by having the success of the video downplayed by each new viewer's being
16  told, in essence, that the video was less popular than it was in actuality.

17       There was no need for defendants to remove the display of the video
18  from the YouTube Website under its restored third URL, because by that
19  juncture, Plaintiff's enthusiasm to execute any further promotion and
20  advertising campaign to promote views of the video had been eliminated;
21  and defendants were able to ascertain through their aforesaid tracking
22  technology that access to the video was substantially coming through
23  viewers that were navigating through the YouTube Website.

24  47.   With respect to the removal of the display of the "Cowgirl " video
25  from YouTube as described above, Plaintiff's position was comparable to a mouse
26  in the grass under the feet of two elephants (Google and Clear Channel) engaged
27  in battle above the hapless mouse.  Further, Plaintiff is informed and believes and
28  thereupon alleges that in addition to the anti-competition motivation of defendants

with regard to Clear Channel, there was another motivation for the removal as well:

One of the options available to a video displayer on YouTube is to permit defendants to embed advertisements with one's displayed video such that viewers of the video are given direct access to the advertisement, similar to advertisements on a television program. In posting the "Cowgirl" video to the YouTube Website, Plaintiff declined YouTube's invitation to permit advertising to be embedded with the display of said video. Notwithstanding Plaintiff's declination to permit such advertising, without Plaintiff's permission, defendants embedded advertisement with the display of the "Cowgirl" video.

Plaintiff is informed and believes and thereupon alleges that in addition to their anti-competitive motivation as against Clear Channel, defendants were motivated to directly suppress the business success of Plaintiff, especially as pertains to the music career of Darnaa. There is only a finite amount of money available for advertising pertaining to music videos. Defendant Google already controls the vast majority of that money in regard to popular music videos by virtue of its management of the advertising on the Vevo music videos (which constitute approximately 75% of the world-wide popular music videos displayed), and controls the majority of the remaining 25% by virtue of its ownership and management control of the YouTube Website which displays the lion's share of the remaining 25% of the world-wide popular music videos displayed.

Therefore, when a company, such as Plaintiff, declines to cooperate in permitting advertising to be embedded with its music video display on YouTube, Google's control of the display of music videos on the Internet makes it simple for it to squelch the ambitions of a small record company such as Plaintiff and/or an unestablished, non-Vevo artist such as Darnaa.

1   The is especially so, when a ticket to becoming an established, economically

2   successful music artist must be acquired by success in garnering substantial

3   numbers of views to one's music videos on YouTube.

4          Thus, not only did Plaintiff and its aforesaid artist find themselves

5   under the feet of the fight picked by Google against Clear Channel, but

6   found themselves directly attacked by defendants because Plaintiff would

7   not play "advertising ball" with the YouTube Website; and since there was

8   no advertising revenue to be lawfully gained form Plaintiff, in the economy

9   of defendants, Plaintiff was subject to squelching.

10         48.     Defendants' aforesaid dastardly removal of the display of the subject

11  video, and the feigned repentance of restoring its display (but uselessly so, with a

12  different URL) was done with knowledge of both of Plaintiff's above then-

13  existing economic relationships, and was designed to disrupt the future economic

14  advantage of those relationships.

15         49.     Said conduct on the part of the defendants in fact disrupted those

16  relationships, essentially making worthless the money and time spent on

17  formulating and executing the aforesaid promotion and advertising campaign with

18  respect to the video; and obviously disrupting the relationship of Plaintiff with

19  Darnaa's fan base who were thwarted in their attempt to view the "Cowgirl" video

20  on YouTube.  Instead of being greeted with the pleasure of watching the subject

21  music video, the positive anticipation of the expectant viewer when clicking on

22  the videos URL was interrupted by a pejorative message to the effect that the

23  video had been removed for violation of the YouTube Terms of Service.

24  Therefore, rather than the expectant viewer's being entertained a by a high quality

25  music video, the viewer was greeted with a cold message that disparaged the

26  integrity of Plaintiff.  Being advised that the video had been removed because the

27  displayer had violated the YouTube Terms of Service impugned the integrity of

28  Plaintiff, portraying it as a company which did not perform its promises, which is

1   the type of company with which a reasonable person would shun doing business.

2   50.   The aforesaid wrongful conduct proximately caused the special and

3   general compensatory damages mentioned above.

4   51.   Based upon the allegations of wrongdoing set forth above, which are

5   specifically incorporated into this paragraph by reference, defendants' behavior

6   constituted despicable conduct perpetrated with willful and conscious disregard of

7   the rights of Plaintiff and subjected it to unjust economic hardship.  Thus, in

8   addition to an award of compensatory damages, Plaintiff is eligible to be awarded

9   damages for the sake of example and by way of punishing defendants in an

10   amount to be determined at the discretion of the trier of fact, but in no event less

11   than $100 million.

12   **THIRD CAUSE OF ACTION**

13   **Negligent Interference with Prospective Economic Advantage,**

14   **Against All Defendants**

15   52.   Plaintiff repeats and realleges each of the above paragraphs and

16   incorporates them herein as if fully set forth.

17   53.   Assuming that the trier of fact finds that defendants did not

18   intentionally and in bad faith remove the display of the "Cowgirl" video from

19   YouTube, and then refuse to properly restore it with its original URL and its

20   legitimately-promoted view count, Plaintiff is informed and believes and

21   thereupon alleges that defendants were negligent in so removing the display of the

22   video and refusing to restore the display with its original URL and its legitimately-

23   achieved view count.

24   54.   The aforesaid wrongful conduct proximately caused the special and

25   general compensatory damages mentioned above.

26   / /

27   / /

28   / /

**FOURTH CAUSE OF ACTION**

**Defamation and/or False Representation of Fact in Violation of Lanham Act,**

**Against All Defendants**

55.     Plaintiff repeats and realleges each of the above paragraphs and incorporates them herein as if fully set forth.

56.     After each of the two removals of the display of the video from the YouTube Website, defendants published the aforesaid pejorative message, accessed by each expectant viewer that arrived at the subject URL to watch the video, that the video had been removed for violation of the YouTube Terms of Service:

> a.     This message was defamatory of Plaintiff in that it impugned the integrity of Plaintiff and thus damaged its business reputation by portraying it as a company which fails to perform its contractual promises, being the type of company with which a reasonable person would shun doing business.

> b.     The publication of the message was in violation of the Lanham Act, 11 U.S.C. § 1125(a), because in connection with goods or services in commerce, it constituted defendants' use of words conveying a false or misleading representation of fact, which in commercial advertising or promotion misrepresented the nature, characteristics or qualities of Plaintiff's goods, services, or commercial activities.

57.     Publication of the aforesaid message proximately caused the special and general compensatory damages mentioned above.

58.     Based upon the allegations of wrongdoing set forth above, which are specifically incorporated into this paragraph by reference, defendants' behavior constituted despicable conduct perpetrated with willful and conscious disregard of the rights of Plaintiff and subjected it to unjust economic hardship.  Thus, in addition to an award of compensatory damages, Plaintiff should be awarded

1  damages for the sake of example and by way of punishing defendants in an

2  amount to be determined at the discretion of the trier of fact, but in no event less

3  than $100 million.

4          Wherefore, Plaintiff prays for judgment against defendants, and each of

5  them, as follows:

6          1.      An award of compensatory damages according to proof, but in no

7  event less than $50 million.

8          2.      An award of exemplary or punitive damages in the discretion of the

9  trier of fact, but in no event less than $100 million.

10         3.      Such other and further relief as the Court deems just and proper.

11

12  Date:  July 10, 2015              Law Offices of Michael R. Shapiro, APC

13                                   /s/ Michael R. Shapiro
                                     Michael R. Shapiro
14                                   Attorney for DARNAA, LLC

15

16  Date:  July 10, 2015              Steinhart Law Offices

17                                   /s/ Terran T. Steinhart
                                     Terran T. Steinhart
18                                   Attorney for DARNAA, LLC

19                      **DEMAND FOR TRIAL BY JURY**

20         Plaintiff hereby demands trial by jury.

21

22  Date:  July 10, 2015              Law Offices of Michael R. Shapiro, APC

23                                   /s/ Michael R. Shapiro
                                     Michael R. Shapiro
24                                   Attorney for DARNAA, LLC

25

26  Date:  July 10, 2015              Steinhart Law Offices

27                                   /s/ Terran T. Steinhart
                                     Terran T. Steinhart
28                                   Attorney for DARNAA, LLC

1045\Complaint

COMPLAINT SEEKING COMPENSATORY AND PUNITIVE DAMAGES